IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JEANIE ARNOLD                                                    PLAINTIFF

v.                          Civil No. 09-3059

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                  DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Diane Sylvester, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g)*.

## I.    Procedural Background:

The plaintiff filed her applications for DIB and SSI on June 8, 2004, alleging an amended onset date of June 29, 2000, due to fibromyalgia, diabetes, blurred vision, irritable bowel syndrome, and anxiety with panic disorder. (Tr. 53-57, 78-79, 89-96, 422-426). Her applications were initially denied and that denial was upheld upon reconsideration. (Tr. 29-33, 36-38, 431-433). Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on October 11, 2006. (Tr. 12-18). Plaintiff was present and represented by counsel.

At this time, plaintiff was 50 years of age and possessed a ninth grade education.  (Tr. 69, 101).  She had past relevant work ("PRW") experience as a general office clerk/secretary.   (Tr. 58-65, 97).

On April 24, 2007, the ALJ found that plaintiff's generalized body aches, insulin dependent diabetes, hypothyroidism, and pain disorder associated with both psychological and general medical conditions were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 14).  After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to lift and carry 11 to 50 pounds occasionally; lift and carry up to 10 pounds frequently; sit, stand, and walk without limitation; use the hands for simple grasping, perform fine manipulation, handle objects, feel objects, push/pull with the hands to operate controls, and reach on a frequent basis; use the feet to push/pull and operate controls on an occasional basis; stoop, crouch, kneel, and crawl on an occasional basis; hear and speak without limitations; and, perform work involving exposure to heights and moving machinery and concentrated exposure to chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations.  (Tr. 15-16).  Mentally, he also found plaintiff limited to work where the interpersonal contact is routine but superficial, the complexity of the tasks is learned by experience with several variables, the use of judgement is within limits, and the supervision requires is little for routine tasks but detailed for non-routine tasks.  With the assistance of a vocational expert, the ALJ found plaintiff could return to her PRW as a general office clerk/secretary.  (Tr. 17-18).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on July 8, 2009. (Tr. 3-5).  Subsequently, plaintiff filed this action. (Doc. # 1).  This case

2

is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Docs. 6, 7).

## II.   **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3),

3

1382(3)(c).  A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.   **Evidence Presented:**

Records indicate that plaintiff had a history of fibromyalgia, bronchitis, gastroesophageal reflux disease ("GERD"), hypothyroidism, recurrent urinary tract infections, irritable bowel syndrome ("IBS"), right temporal mandibular joint syndrome ("TMJ"), sinusitis, otitis media, and anxiety disorder.  (Tr. 134-167, 172-178, 228-237, 389-412).   She was prescribed Amitriptyline, Brontex, Ancef, Ceclor, Librax, Darvocet N, Vioxx, Duract, Elavil, Effexor, Synthroid, Xanax, and Prilosec.  Trigger points, spasticity, cramping, and alternating diarrhea and constipation were common symptoms of her fibromyalgia and IBS.  (Tr. 136, 173).

In May 1996, plaintiff injured her back while gardening. (Tr. 403).  X-rays of her lumbar spine performed in August 1996, revealed some mild bulging of the L4-5 disk and some minimal

4

degenerative changes of the bilateral L4-5 facet joints.  (Tr. 151).  There was no visible encroachment upon the nerve roots.  It appeared that if there was encroachment upon any visible nerve roots, it would be the right L5 nerve root in the superior right L5 lateral recess.  The L5 nerve roots appeared to rise from the thecal sac more superiorly than usual and there was a remote possibility that the right L5 nerve root could be compressed between the mild bulging of the L4-5 disk and the right L5 superior facet.  (Tr. 151).  In October 1996, plaintiff was diagnosed with mild degenerative arthritis of the thoracic spine.  (Tr. 400).

On March 13, 2000, plaintiff reported a six to eight month history of having bright red blood in her stool approximately once per week.  (Tr. 170).  She was using Fibercon, but no stool softners.  Dr. Larry Carey diagnosed plaintiff with internal hemorrhoids and serious otitis and eustachian tube dysfunction.  He advised her to continue the fiber supplement therapy and to add Colace daily.  He also prescribed Anusol-HC suppositories twice daily following sitz baths.  For the ears, Dr. Carey prescribed an antihistamine/decongestant of her own choosing.  He stated that he would add Nasonex if plaintiff did not see any improvement.  (Tr. 170).

This same day, Dr. Ben Harmon noted that plaintiff's fibromyalgic complaints continued under fair control.  (Tr. 171).  She was given prescriptions for Amitriptyline and a nonsteroidal.  He indicated that plaintiff looked better than she had in some time.  (Tr. 171).

On June 27, 2000, Dr. Klepper treated plaintiff for a urinary tract infection and tracheobronchitis.  (Tr. 227, 388).  He prescribed Ancef and Levaquin.  (Tr. 227).

On July 25, 2000, plaintiff was diagnosed with a viral syndrome, otalgia secondary to GERD, and costochondritis.  (Tr. 289).  The doctor prescribed Celebrex and advised her to double her dosage of Prilosec.  (Tr. 289).

AO72A
(Rev. 8/82)

On August 31, 2000, plaintiff presented at Dr. Carey's office for a thyroid recheck. (Tr. 169). She reported a history of hypothyroidism and fibromyalgia. Plaintiff indicated that she had recently increased her Darvocet dosage and was now experiencing headaches. At this time, her medications included Clindex, Elavil, Premarin, Synthroid, and Darvocet N. A physical examination revealed no abnormalities. She was alert and oriented with a slightly flat affect. Dr. Carey diagnosed plaintiff with musculoskeletal headaches, fibromyalgia, and hypothyroidism. He ordered tests to monitor her TSH levels and gave plaintiff a year of refills on all of her medications, except for the Darvocet. She was given a two month prescription for Darvocet and advised to follow-up with Dr. Harmon when he returned from medical leave. (Tr. 169).

On September 25, 2000, plaintiff was again treated for tracheobronchitis. (Tr. 227, 388). She complained of increasing sputum production and increasing discomfort interfering with her activities of daily living. Dr. Klepper prescribed Ancef, Ceclor CD, and Darvocet N. (Tr. 227).

On November 10, 2000, plaintiff was diagnosed with acute bronchitis. (Tr. 288). The doctor noted her history of fibromyalgia and that she had been seeing a specialist in Springfield. He prescribed Doxycycline, Tessalon, and Darvocet N. (Tr. 288).

On January 16, 2001, plaintiff complained of suprapubic pain. (Tr. 287). She said walking worsened the pain. Plaintiff also complained of chronic constipation. The doctor advised her to see a rheumatologist. He then prescribed Elavil, Darvocet N , Prilosec, and Clindex and advised her to apply heat to her abdominal wall. The doctor also told her to continue the Synthroid and Premarin she was currently taking. (Tr. 287).

6

On January 23, 2001, plaintiff complained of pelvic and abdominal discomfort. (Tr. 195). She underwent a pelvic ultrasound that was completely unremarkable. (Tr. 168). Dr. William Otto diagnosed her with "must consider fibromyalgia or irritable colon." He indicated that she may need to see a gastroenterologist. Dr. Otto then prescribed Darvocet and Premarin. (Tr. 195).

On March 7, 2001, plaintiff followed-up with Dr. Klepper concerning her knee. (Tr. 226, 387). She had fallen two days prior and hurt her knee and foot. She had also developed an earache. Plaintiff had increasing pain in her knee and foot, although she was able to ambulate. An examination revealed a decreased range of motion in the right knee secondary to pain. There were some superficial abrasions, but no crepitus or contractions. Muscle tone and strength were normal and no atrophy or abnormal movements were noted. Dr. Klepper diagnosed her with a contusion to her right knee and foot and prescribed Darvocet and Doxy tabs. (Tr. 226).

On March 16, 2001, plaintiff complained of pain in her left side, urinary frequency, urgency, and dysuria. (Tr. 226, 387). She was also running a low grade fever with chills. Plaintiff was diagnosed with a urinary tract infection and prescribed Levaquin and Skelaxin. (Tr. 226).

On July 3, 2001, plaintiff reported bilateral lower back pain, fatigue, abdominal pain, ear pain, nasal stuffiness, and rhinorrhea. (Tr. 286). Her fasting blood sugar level was 326. The doctor noted her history of fibromyalgia , but diagnosed her with Type II diabetes and fatigue. He then prescribed Glucophage XR. (Tr. 286).

AO72A
(Rev. 8/82)

On July 18, 2001, plaintiff complained of diarrhea and increased stress. (Tr. 285, 386). She also requested Darvocet for her fibromyalgia. The doctor diagnosed her with Type II diabetes, dyslipidemia, and fibromyalgia. He prescribed Glucophage and Darvocet. (Tr. 285).

On June 18, 2001, Dr. Klepper treated plaintiff for acute sinusitis and a urinary tract infection. (Tr. 225). He prescribed Levaquin, Darvocet-N, and Ancef. (Tr. 225).

On August 29, 2001, plaintiff returned for her annual exam with Dr. Otto. (Tr. 195). She had recently been diagnosed with diabetes and was taking Glucophage. Plaintiff also needed some Lorazepam for sleep. Dr. Ottor diagnosed her with an estrogen deficiency and prescribed Darvocet N and Lorazepam. (Tr. 195).

On September 14, 2001, plaintiff was experiencing some drainage for her right ear, a cough, abdominal bloating, abdominal cramping, and diarrhea. (Tr. 284). She stated that stress negatively impacted her symptoms. Plaintiff indicated that she was following the diabetic diet, but that the Clindex was not helping. The doctor noted her fasting blood sugar level to be 125. He diagnosed her with Type II diabetes, IBS, and sinusitis. He prescribed Bactrim, Bentyl, and Glucophage.

On December 14, 2001, plaintiff complained of a knot behind her right ear that was painful. (Tr. 281). She was also experiencing recurrent fever blisters and light headedness. The doctor diagnosed her with type II diabetes, fever blisters, and myofascial pain. He noted that plaintiff had requested Darvocet, so Darvocet N was prescribed as was Valtrex. (Tr. 281).

On March 11, 2002, plaintiff followed-up with complaints of abdominal pain. (Tr. 280). Her pain was reportedly worse with movement and had been ongoing for over a week. At this

AO72A
(Rev. 8/82)

time, her fasting blood sugar was only 118. The doctor diagnosed her with IBS and fibromyalgia. He prescribed Darvocet and Buspar. (Tr. 280).

On May 16, 2002, plaintiff had a tender left breast and was experiencing vertigo. (Tr. 279). She also requested Diazepam for nervousness. An examination revealed tenderness in the chest wall and a flat affect and anxious mood. The doctor diagnosed plaintiff with vertigo, chest wall tenderness, and IBS. He ordered an IBS study, blood work to check her A1c levels, and a mammogram. (Tr. 279).

On August 16, 2002, plaintiff presented with complaints of painful urination and a low grade fever over the previous several days. (Tr. 278). She also reported a bitter taste in her throat, nausea, and right ear pain. The doctor diagnosed her with sinusitis and a urinary tract infection. She was prescribed Levaquin. (Tr. 278).

On August 22, 2002, plaintiff's urinary tract infection persisted, in spite of finishing her antibiotics. (Tr. 277). Her blood sugar level that morning was 420 and it had been 398 the previous evening. An examination revealed mild suprapubic discomfort with palpation and mild costovertebral angle tenderness. The doctor diagnosed plaintiff with a urinary tract infection and high blood sugar. He administered a Rocephin injection and prescribed oral hydration. The doctor indicated that he would see plaintiff back the following morning to see if medication changes were necessary. He then prescribed Darvocet N for her discomfort. (Tr. 277).

On August 23, 2002, plaintiff's glucose level was 263 and she continued to experience low abdominal discomfort. (Tr. 276). There was also glucose in her urine. The doctor diagnosed her with a bladder infection. He administered a Rocephin injection and prescribed Bactrim DS and Levaquin. (Tr. 276).

9

On September 12, 2002, plaintiff's fasting blood sugar level was 276. (Tr. 275). She had also seen her gynecologist on August 30 and was told she had bacteria in her urine. The doctor prescribed Macrobid. Plaintiff had taken her last pill the day prior to this appointment. However, she reported continued burning with urination. Plaintiff also complained of sinus and chest congestion, a productive cough, and back pain. The doctor diagnosed her with recurrent urinary tract infections, bronchitis, and diabetes under poor control. He administered a Rocephin injection and then prescribed Levaquin, an increased dosage of Glucophage, and oral hydration. (Tr. 275).

On September 19, 2002, plaintiff felt better. (Tr. 274). However, she continued to experience burning with urination, urinary frequency, and sinus congestion. Her blood sugar levels were running between 200 and 250. The doctor diagnosed plaintiff with diabetes mellitus under poor control and cystitis. He prescribed Levaquin, Glucophage, and oral hydration. (Tr. 274).

On September 25, 2002, plaintiff continued to experience burning with urination and urinary frequency. (Tr. 273). A urinalysis was negative, but did reveal traces of sugar. Her fasting blood sugar level was 276. The doctor diagnosed her with diabetes under poor control and a yeast infection. He added Glucotrol XL and prescribed Diflucan. (Tr. 273).

On November 4, 2002, plaintiff's diabetes was under slightly better control. (Tr. 272). She felt better and her sugar levels were running between 150 and 250. The doctor diagnosed her with improving diabetes, yeast infection, bronchitis/sinusitis, and dry skin. He prescribed Glucophage XR, Glucotrol XL, Diflucan, Avelox, and Eucerin cream. (Tr. 272).

10

On December 9, 2002, plaintiff's diabetes was under better control.  (Tr. 271).  Her Glucotrol dosage was increased and she was advised to continue the Glucophage and monitor her daily glucose levels.  (Tr. 271).

On February 3, 2003, plaintiff complained of experiencing the symptoms of a urinary tact infection.  (Tr. 270).  An examination revealed supra pubic discomfort.  Plaintiff was diagnosed with cystitis and prescribed Levaquin, Peridium, and Darvocet.  (Tr. 270).

On May 21, 2003, plaintiff presented for medication refills and blood work for her diabetes.  (Tr. 321).  She was diagnosed with insulin dependent diabetes mellitus and fibromyalgia and given a refill of Amitriptyline.  (Tr. 321).

On July 1, 2003, plaintiff sought emergency treatment for lower abdominal pain and burning that lasted a few day, hematuria since the previous Thursday, and a low grade fever.  (Tr. 309-317).  On examination, the doctor noted mild tenderness in the right upper quadrant, left lower quadrant, and suprapubic area.  Her urethral meatus was irritated.  Dr. Byron Ganbaldi diagnosed her with a possible cystocele (drooping bladder).  Plaintiff was diagnosed with lower abdominal pain not otherwise specified, type II diabetes, possible adhesions, and urethritis.  She responded well to Pyridium and Toradol.  (Tr. 309-317).

On July 7, 2003, plaintiff reported suffering from a cough, congestion, low-grade fever, and chills.  (Tr. 223, 384).  She also needed a refill of her pain medications and medication for her fibromyalgia.  An examination was normal.  Dr. Klepper diagnosed her with acute bronchitis and fibromyalgia.  He prescribed Elavil, Ativan, Darvocet N, and Doxy tabs.  (Tr. 223).

On July 14, 2003, sought treatment for abdominal pain, blood in her urine, and pain with urination.  (Tr. 298-307).  An examination revealed an inflamed urethral meatus that was quite

11

tender to palpation.  The doctor indicated that plaintiff might have a small cystocele (drooping bladder).  Because she had previously obtained symptomatic relief with Pyridium and Toradol, these medications were prescribed again.  It was recommended that plaintiff see a urologist or gynecologist.  (Tr. 299-307).

On July 23, 2003, plaintiff continued to experience lower abdominal pain and dysuria. (Tr. 323).  She was also congested and stated that she had been treated for urethritis in the ER on two occasions.  Dr. Sheldon diagnosed plaintiff with fibromyalgia with trigger points in the pyramidalis muscles referring pain to the lower abdomen and myofascial pain.  He administered two trigger point injections into the pyramidalis muscles.  (Tr. 323).

On August 21, 2003, plaintiff was treated for otitis exterma and anxiety.  (Tr. 324).  She complained of a sore throat, ear ache, and panic attacks.  Her ear canal was mildly to moderately irritated. The nurse practitioner recommended that she consider Prozac, but advised her to keep in mind that she was taking Elavil for her fibromyalgia.  Cortisporin was prescribed to treat her ear pain.  (Tr. 324).

On December 18, 2003, plaintiff reported chest congestion and the symptoms of a bladder infection.  (Tr. 328).  She was also out of her diabetic medications.  Her blood sugar level was 321. Blood work also revealed elevated lipids.  Dr. Pearson diagnosed plaintiff with dyslipidemia and prescribed Synthroid and Zocor.  He also gave her refills of Metformin and Glucotrol.  (Tr. 328).

On February 11, 2004, plaintiff was again treated for acute bronchitis and fibromyalgia. (Tr. 223, 384).  Dr. Klepper prescribed Ancef, Doxy tabs, Darvocet-N, and Ativan.  (Tr. 223).

12

On April 1, 2004, plaintiff stated that her blood sugar medication was making her feel sick. (Tr. 329). She experienced diarrhea for seven to eight days. However, when she stopped the Glucophage and the diarrhea also stopped. Dr. Pearson noted that she had a history of IBS with painful bowel movements and constipation. He diagnosed her with diabetes under poor control, IBS with rectal irritation and gastritis, and fibromyalgia. Dr. Pearson prescribed Prilosec and indicated that he would consider placing her on insulin. Refills of Glucotrol and Elavil were given. (Tr. 329)

On May 19, 2004, plaintiff was admitted to the hospital due to uncontrollable diabetes and sinusitis. (Tr. 205-219, 222, 383). Over the previous few weeks, she had experienced increasing weakness, polydipsia, polyphagia, and polyuria. Her A1c at Dr. Klepper's office was 450. Urinalysis on admission showed trace glucose, but was negative for ketones. Aside from a potassium level of 3, her electrolytes showed to be normal and a serum acetone was negative. An EKG showed non-specific ST changes and a CT scan of her brain was normal. X-rays of her chest, cervical spine, and left shoulder were all also normal. Plaintiff's initial glucose screen was 411. She was placed on IV insulin and continued on her home medication of Glucophage, Amitriptyline, Ativan, Synthroid, and Darvocet N. The insulin drip was stopped on the evening of May 19. Plaintiff was begun on injections of Novolin and sliding scale Cleocin. Her sugar levels slowly improved and a fasting glucose screen performed on May 22 revealed a level of 102. She was discharged on May 23, 2004, on Glucophage, Synthroid, Elavil, Ativan, Cleocin, Novolin, and Darvocet N. Dr. Klepper indicated that her discharge diagnoses were uncontrolled diabetes, sinusitis, migraine headaches, and hypothyroidism. (Tr. 205-219).

13

On June 2, 2004, plaintiff's home blood sugar levels were low in the mid-mornings and afternoons. (Tr. 221, 382). She was experiencing recurrent weak episodes, but her headaches had improved. At the time of her appointment, her blood sugar level was 33. A physical examination was normal. Dr. Klepper diagnosed plaintiff with insulin-dependent diabetes, improving and sinusitis, improving. He decreased her morning and evening insulin dosages and asked her to return in three weeks. (Tr. 221).

On June 17, 2004, plaintiff was feeling better. (Tr. 221). She had experienced no further hypoglycemic episodes. Her blood sugar levels at home were averaging about 140 fasting. However, her sinuses had recurred and her headache returned. Dr. Klepper diagnosed her with poorly controlled insulin dependent diabetes, sinusitis, and hypothyroidism. He prescribed Doxy-Tabs, Metformin, Synthroid, Elavil, Darvocet, Ativan, and increased her morning insulin dosage. (Tr. 221).

On August 27, 2004, plaintiff complained of urinary frequency, urgency, and a sinus headache. (Tr. 220, 381). A physical examination was normal. Dr. Klepper diagnosed plaintiff with a urinary tract infection and prescribed Levaquin and Xanax. (Tr. 220).

On September 24, 2004, Dr. Klepper verified with the pharmacist that plaintiff's Amitriptyline dosage was 25 milligrams, not 100 milligrams. (Tr. 339).

On October 21, 2004, plaintiff requested a refill of her Amitriptyline. (Tr. 339). The pharmacist called requesting authorization to refill it at 100 milligrams. He indicated that plaintiff was taking four of the 25 milligram tablets daily. Dr. Klepper's office advised the pharmacist that plaintiff would need to be seen. (Tr. 339).

14

On December 14, 2004, plaintiff underwent a mental status and evaluation of adaptive functioning with Dr. Charles Nichols.  (Tr. 247-250).  Plaintiff denied having a stable employment history, reporting that she was primarily a homemaker and raised two sons.  In fact, she could not specifically recall her last period of employment.  Plaintiff stated that her work limiting condition was chronic pain secondary to fibromyalgia, which she had been diagnosed with approximately ten years earlier.  She indicated that the pain focused on the sides of her legs, her back, left arm and her hips.  Plaintiff also reported experiencing Type II diabetes and hypothyroidism, but indicated that neither of these significantly impacted her ability to work.  She denied a history of outpatient or inpatient mental health treatment, although she had taken Amitriptyline for the past ten years.  Plaintiff had also recently been prescribed Xanax for anxiety, due to sudden bouts of feeling overwhelmed and crying spells related to her pain.  Lorazepam had been prescribed as a sleep aid for the previous six to eight years.  She found that all three medications, particularly the Amitriptyline, were helpful in reducing her depression and pain symptoms.  (Tr. 247-250).

Dr. Nichols noted that plaintiff was solemn and "matter-of-fact."  (Tr. 247-250).  Few facial expressions were noted, even when the evaluator attempted to lighten the discussion by talking about her Christmas plans.  However, plaintiff was also highly cooperative and appropriate.  She frequently stood up and took a few steps and seemed highly uncomfortable while sitting.  Plaintiff needed to move to maintain comfort.  Her responses tended to be brief and lack descriptive details, although she was able to provide details when prompted by the examiner.  Plaintiff's mental pace was also slower than typical for an adult and her persistence was poor.  She denied hallucination or delusions.  Plaintiff's affect during the interview was

15

dysphoric and restricted in range.  She described her typical mood as "in the middle."  Plaintiff denied regular periods of depression, except when her hypothyroidism needed adjustment.  She also indicated that she tended to feel depressed for short periods when her pain was the most intense.  Plaintiff reported a poor energy level, but denied appetite, weight, or sleep problems.  She denied suicidal thoughts and enjoyed being around others.  Plaintiff stated that she had a close friend whom she frequently telephoned.  She also indicated that she could care for her own personal hygiene, prepare meals for herself and her husband, drive in to town or her mother's house when necessary, and perform household chores such as laundry, dusting, and "picking up stuff."  Plaintiff also reportedly enjoyed reading and watching television.  She had previously enjoyed shopping, but the walking was now too painful and no longer allowed her to do this.  Dr. Nichols diagnosed plaintiff with pain disorder associated with both psychological factors and a general medical condition and assessed her with a global assessment of functioning score of 58.  He concluded that her current psychological condition was judged to be fairly dependent on her level of pain.  Dr. Nichols indicated that pain management might help plaintiff cope with her pain more effectively and reduce her depressive symptoms.  He also stated that she was able to hear and remember simple to moderately complex instructions, could interact well with other employees, and handle the psychological demands of work pressure.  (Tr. 247-250).

On December 22, 2004, plaintiff was treated for acute bronchitis and diabetes.  (Tr. 339, 380).  Her blood sugar levels were averaging 100-150, in spite of being ill.  Dr. Klepper prescribed Ancef and Keflex.  He also refilled her Phenergan with Codeine and increased her Amitriptyline dosage to 100 milligrams.  (Tr. 339).

AO72A
(Rev. 8/82)

On February 11, 2005, plaintiff's blood sugars had been high for the past several days. (Tr. 338, 356, 379). She had not been checking her sugars regularly or following her diet closely, but was taking her insulin as prescribed. Dr. Klepper diagnosed her with uncontrolled diabetes, increased her insulin, and advised her to restart the 1800 calorie American Diabetic Association diet. (Tr. 338).

On February 22, 2005, plaintiff was evaluated by Dr. Scott Ferguson for pelvic prolapse or a dropped bladder. (Tr. 332, 375, 379). She reported significant mixed stress urge incontinence causing her to dampen one pad per day. Plaintiff stated that her incontinence was generally triggered when rising from a sitting position or while sitting. She also complained of recurrent urinary tract infections for the previous two to three months that resulted in dysuria and were slow to respond to antibiotics. In addition, plaintiff reported problems with constipation for which she had placed herself on a stool softner. A recent examination by Dr. Klepper had indicated that plaintiff was suffering from pelvic organ prolapse. A urinalysis revealed three plus glucose in her urine. Dr. Ferguson diagnosed plaintiff with atrophic vaginitis, pelvic organ prolapse, and mixed stress/urge incontinence. He prescribed Estrace cream and anticholinergic therapy to address her urge incontinence. Urine cytology was ordered and an upper tract evaluation recommended for her next appointment. (Tr. 332).

On this same date, plaintiff followed-up with Dr. Klepper. (Tr. 337, 338, 355, 356). Recent lab work had reveled a glucose level of 308. Dr. Klepper diagnosed her with poorly controlled diabetes. He increased her insulin dosages, refilled her Darvocet N prescription, and prescribed Ativan and an 1800 calorie diet. (Tr. 337).

17

On March 7, 2005, plaintiff's insulin dosages were decreased due to low glucose readings at night and in the morning. (Tr. 337).

On July 14, 2005, plaintiff complained of urinary frequency, urgency, and dysuria. (Tr. 355, 375). Her blood sugars had been high. Plaintiff indicated that she had been cutting back on her insulin instead of taking the doses as prescribed. Dr. Klepper diagnosed her with a urinary tract infection, poorly controlled diabetes, and poor compliance with medical treatment and diet. He increased her insulin dosages, restarted the diabetic diet, and prescribed Cipro. Plaintiff declined admission at this time. She indicated that she would monitor her sugar more closely and would return to the clinic in a week or sooner if her symptoms worsened. (Tr. 355).

On November 3, 2005, plaintiff had not been checking her blood sugars closely, but thought they were "all right" because her vision was good. (Tr. 354, 373). Dr. Klepper diagnosed her with poorly controlled insulin-dependent diabetes and increased her insulin dosages. He also prescribed Darvocet N to be taken as needed for pain and refilled her Lorazepam for sleep. Dr. Klepper also stressed the importance of plaintiff watching her diet and exercising. (Tr. 354).

On February 22, 2006, plaintiff was evaluated by Dr. Gary Nunn, an internist. (Tr. 359-360). Plaintiff reported a history of insulin dependent diabetes, fibromyalgia, hypothyroidism, and IBS. She complained of body aches primarily in her lower extremities and lower back. Plaintiff indicated that she could walk one block, stand for 20 minutes, and sit for 20 minutes. Dr. Nunn's examination revealed a full range of motion in all extremities, no gross neurologic deficits, intact deep tendon reflexes, and intact and normal sensation. He diagnosed her with generalized body aches, insulin dependent diabetes, and hypothyroidism. (Tr. 360).

18

This same date, Dr. Nunn completed a physical RFC assessment. (Tr. 361). He indicated that plaintiff could never lift over 50 pounds, occasionally lift 11-50 pounds, and frequently lift less that 10 pounds. Dr. Nunn found that plaintiff could frequently grasp, perform fine manipulation, handle objects, feel objects, operate controls with hands, and reach. Plaintiff could only occasionally operate controls with her feet, balance, stoop, crouch, kneel, and crawl. He was of the opinion that she could sit, stand, and walk for a total of 8 hours per day. Further, Dr. Nunn concluded that plaintiff could never climb or balance. As for environmental exposures, he indicated that she should avoid all exposure to heights and moving machinery and avoid concentrated exposure to chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations. (Tr. 361).

On July 12, 2006, plaintiff was treated by Dr. Kevin Richter at the Boston Mountain Rural Health Center. (Tr. 370, 414). She continued to have elevated blood sugar levels, in spite of taking insulin as prescribed. An examination revealed a regular heart rate and rhythm, clear lungs, a non-tender abdomen, and no cyanosis or clubbing of the extremities. A random blood sugar test revealed a level of 273. However, her fasting blood sugar level that morning had been 432. A urinalysis was clear, except for three plus glucose. Dr. Richter diagnosed plaintiff with diabetes mellitus type I and II with a previously good response to Metformin, fibromyalgia, hypothyroidism, anxiety disorder, insomnia, and depression. He advised plaintiff to continue the Amitriptyline, Darvocet, Synthroid, and Lorazepam. Dr. Richter also prescribed Cymbalta and Actos plus. (Tr. 414).

On January 8, 2006, an x-ray of plaintiff's abdomen was normal. (Tr. 358).

19

On August 11, 2006, plaintiff presented at the Boston Mountain Rural Health Center for a reevaluation. (Tr. 413). Dr. Richter noted that she had combined Type I and Type II diabetes, fibromyalgia, hypothyroidism, anxiety with attacks, insomnia, depression, and GERD. Her blood sugar levels had been in the 200 range, sometimes below in the mornings. On examination, plaintiff was mildly tender to palpation of the lumbar sequel paraspinal musculature on the left and left gluteal region. Plaintiff indicated that she had been taking Darvocet more recently due to an exacerbation of sciatic nerve pain in her left lower extremity. She had also stopped the Cymbalta due to stomach upset. Plaintiff had taken Nexium in the past and wished to get on a program for this medication. Dr. Richter diagnosed plaintiff with diabetes mellitus type I/II, fibromyalgia, and sciatica. He advised her to continue the Actos, Levothyroxine, Darvocet, and Novolin as prescribed. Because increasing her Levothyroxine dosage had made her feel much better, he opted to hold off on prescribing an antidepressant. He also noted that they would follow-up with plaintiff after she received her medication through the PAP program. (Tr. 413).

**IV.**   **Discussion:**

Plaintiff contends that substantial evidence does not support the ALJ's credibility findings with regard to the fatigue associated with her diabetes mellitus and does not support the ALJ's conclusion she can return to her PRW.

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

20

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In the present case, plaintiff alleged disability due to fibromyalgia, diabetes, blurred vision, irritable bowel syndrome, and anxiety with panic disorder. (Tr. 53-57, 78-79, 89-96, 422-426). The evidence does indicate that plaintiff suffered from symptoms relating to diabetes mellitus. However, this treatment was essentially conservative in nature, consisting of oral

21

medications and insulin injections. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). She was hospitalized on only one occasion. While we note that plaintiff's diabetes was most often diagnosed as uncontrolled, we are also cognizant of the fact that she did not take her medication as prescribed and failed to follow the American Diabetic Associations' diet as she was instructed to do by her doctor. (Tr. 338, 354, 355). *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."). Plaintiff also told Dr. Nichols that her diabetes did not significantly impair her ability to work. (Tr. 247).

Plaintiff's main contention is that the ALJ's credibility evaluation concerning the pain and fatigue associated with her diabetes is not support by substantial evidence. As previously noted, plaintiff has failed to show that her diabetes was a disabling condition. While we do not doubt that plaintiff suffered from some fatigue and discomfort due to this impairment, we can find no evidence to indicate that she sought consistent treatment for this pain or fatigue. Had her condition been as severe as alleged, we believe plaintiff would have sought more treatment for her symptoms and would have followed the course of treatment, including the diet, as prescribed by her doctor. Her failure to do so evidences the fact that her condition was not as severe as alleged.

Plaintiff has also alleged pain and a burning sensation in her legs, hips, and shoulder with prolonged standing, due to fibromyalgia. She testified that she was unable to work due to back and bilateral leg pain, pain in her hands, weakness, in her arms, and an inability to grip with her hands. The evidence does indicate that plaintiff had a history of fibromyalgia. *See Trenary v.*

22

*Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (holding that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis). However, she relies upon medical records dated prior to the relevant time period and while she continued to work to support her contention that she was disabled during the relevant time period.

Medical evidence dated during the relevant time period indicates that plaintiff received only conservative treatment for her fibromyalgia. Plaintiff was treated via medication and a steroid injection. No hospitalizations were reported and there is no indication in the record that plaintiff's treating doctor found plaintiff's condition to be disabling. *See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (observing that none of the plaintiff's treating physicians offered an opinion that the plaintiff was disabled or made any statement or recommendation that he was unable to work at an SGA level). In fact, in 2003, Dr. Klepper indicated that plaintiff's gait and station were normal, she had a normal range of motion, and she had normal muscle strength and tone. (Tr. 223). Another examination by Dr. Klepper in 2004 revealed normal sensory, motor, and coordination. (Tr. 207). In February 2006, Dr. Nunn's examination revealed a full range of motion in all extremities, no gross neurologic deficits, intact deep tendon reflexes, and intact and normal sensation. (Tr. 360). Dr. Richter's examinations also revealed only mild tenderness to palpation in the lumbar spine. (Tr. 370, 413). Further, in 2004, plaintiff told Dr. Nichols that previous prescriptions for Xanax, Amitriptyline, and Lorazepam, particularly the Amitriptyline, were helpful in reducing her depression and pain symptoms. (Tr. 247-250). *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("[i]mpairments that are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed

course of treatment without good reason can be a ground for denying an application for benefits"). Thus, while we do agree that her fibromyalgia was severe and somewhat limiting, we do not believe the ALJ erred in concluding that it was not disabling.

On a related note, we are also cognizant of the x-rays from August 1996 that revealed some mild bulging of the L4-5 disk and some minimal degenerative changes of the bilateral L4-5 facet joints. (Tr. 151). It should be noted that both the disk bulging and the degenerative changes were found to be merely mild. *See Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). And, there was no visible encroachment upon the nerve roots. While the report does go on to state that if there were any encroachment, it would be the right L5 nerve root in the superior right L5 lateral recess, plaintiff did not undergo further testing to determine if an encroachment actually existed. Had this impairment been as severe as alleged, plaintiff would have followed-up with additional testing to determine if nerve encroachment was actually a problem. Further, plaintiff's own admission in 2004 that medication was helpful in reducing both her pain and depressive symptoms demonstrates that her condition was amenable to treatment.

Plaintiff was also diagnosed with IBS, which resulted in abdominal pain, chronic constipation, and occasional diarrhea. (Tr. 136, 173, 273, 280, 284, 329). In spite of her complaints, however, it appears that her last treatment for this condition occurred in 2005. Further, it appears that her treatment consisted of over-the-counter stool softners. Had this condition been as severe as contended, we believe plaintiff would have sought more consistent treatment for her condition. Here again, we can not say this condition was disabling.

24

Likewise, while plaintiff was diagnosed with hypothyroidism, we can find no evidence to suggest that this condition was severe enough to disable.  Medication was prescribed and it does at least appear that this condition was amenable to treatment.  *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

Although alleged by plaintiff, we can find no evidence to show that she suffered from blurred vision.  Further, the evidence does not indicate that she sought any type of treatment related to a severe eye impairment.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  Accordingly, we do not find err with the ALJ's conclusion with regard to this impairment.

Lastly, plaintiff claims disability due to anxiety and panic attacks.  It is clear that plaintiff was treated via Amitriptyline by her primary care doctor.  Xanax also appears to have been prescribed, at least for a period of time.  (Tr. 220).  However, the record is devoid of any evidence to indicate that plaintiff was ever hospitalized due to her condition .  In fact, she did not even seek treatment from a mental health provider.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating plaintiff's allegations of disability due to a mental impairment).  The only psychological evaluation contained in the file was performed by Dr. Nichols at the request of the administration.  (Tr. 247-250).  He concluded that she had only moderate difficulties in social, occupational, or school functioning as evidenced by a GAF score of 58.  Dr. Nichols also indicated that she was able to hear and remember simple to moderately complex instructions, interact well with other employees, and handle the

25

psychological demands of work pressure. (Tr. 247-250). Clearly, plaintiff's mental impairments were not as severe as alleged.

Plaintiff's activities of daily living also undermine her claim of disability. On a supplemental interview outline, plaintiff reported the ability to care for her personal hygiene, do the laundry, wash dishes, change the sheets, shop for groceries, and prepare meals. (Tr. 66-70). On an adult function report, she stated that a typical day consisted of cleaning the house, doing the laundry, preparing meals, reading a book, and visiting with her family. (Tr. 80). She also stated that she could feed her dog, pay bills, count change, walk, drive a car, occasionally sew, talk on the phone, and attend church. (Tr. 80-87). Further, plaintiff told Dr. Nichols that she could care for her own personal hygiene, prepare meals for herself and her husband, drive in to town or her mother's house when necessary, and perform household chores such as laundry, dusting, and "picking up stuff." (Tr. 247-250). Plaintiff also reportedly enjoyed reading and watching television. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Next, plaintiff contends that the ALJ did not consider her impairments in combination. The Social Security regulations provide that the Commissioner is to consider the combined effect

of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of such sufficient severity. *See* 20 C.F.R. § 404.1523. Plaintiff contends that she is disabled due to the combined effect of her physical and mental impairments. Here, the ALJ found that the evidence did not document the existence of any impairment or combination of impairments that met or equaled a listed impairment. (Tr. 15). He also concluded that plaintiff's subjective allegations were fully credible as they were not borne out by the overall record. (Tr. 15). The Eighth Circuit has held that such language demonstrates that the ALJ considered the combined effect of plaintiff's impairments. *See Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994).

We must also review the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

27

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of one examining consultant, and several non-examining, consultative doctors.  On August 4, 2004, Dr. Ronald Crow completed a physical RFC assessment. (Tr. 238–245).  After reviewing plaintiff's medical records, he concluded she could perform medium level work.  (Tr. 238-245).

Dr. Nunn also evaluated plaintiff in 2006 and determined that she could occasionally lift 11-50 pounds and frequently lift less that 10 pounds; frequently grasp, perform fine manipulation, handle objects, feel objects, operate controls with hands, and reach; and, occasionally operate controls with her feet, balance, stoop, crouch, kneel, and crawl.  He concluded that she could sit, stand, and walk for a total of 8 hours per day.  Further, Dr. Nunn concluded that plaintiff could never climb or balance.  As for environmental exposures, he indicated that she should avoid all exposure to heights and moving machinery and avoid concentrated exposure to chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations.  (Tr. 361).

On January 3, 2005, Dr. Dan Donahue completed a mental RFC assessment and a psychiatric review technique form.  (Tr. 251-267).  After reviewing plaintiff's medical records, he determined that plaintiff was suffering from pain disorder associated with both a psychological and general medical condition.  He concluded that her activities of daily living were only mildly limited, while her ability to maintain social functioning and concentration, persistence, and pace were moderately limited.  Dr. Donahue indicated that her ability to maintain attention and concentration for extended periods, to complete a normal workday or work week without interruptions from psychologically based symptoms, and to perform at a

28

consistent pace without an unreasonable number and length of rest periods was moderately limited. No episodes of decompensation were noted. Dr. Donahue also concluded that plaintiff could perform work where the interpersonal contact was routine, but superficial; the complexity of the tasks was learned by experience with several variables; the use of judgment was within limits; and, the supervision required was little for routine, but detailed for non-routine tasks. (Tr. 251-267).

We also note Dr. Nichols' assessment that plaintiff's GAF was indicative of only moderate symptoms, but that plaintiff was able to hear and remember simple to moderately complex instructions, interact well with other employees, and handle the psychological demands of work pressure. (Tr. 247-250).

Giving proper credit and weight to the medical records and the RFC assessments contained within the record, we find that the ALJ properly concluded that plaintiff retained the residual functional capacity to lift and carry 11 to 50 pounds occasionally; lift and carry up to 10 pounds frequently; sit, stand, and walk without limitation; use her hands for simple grasping, fine manipulation, to handle objects, to feel objects, to push/pull with the hands to operate controls, and to reach on a frequent basis; use her feet to push/pull and operate controls on an occasional basis; stoop, crouch, kneel, and crawl on an occasional basis; hear and speak without limitations; and, must avoid all exposure to work involving heights and moving machinery and concentrated exposure to chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations. (Tr. 15-16). Mentally, we also agree with his findings that plaintiff could perform work where the interpersonal contact is routine but superficial, the complexity of the tasks is learned by

29

AO 72A
(Rev. 8/82)

experience with several variables, the use of judgement is within limits, and the supervision required is little for routine tasks but detailed for non-routine tasks.

We next evaluate the testimony of the vocational expert. Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified that a person who could lift and carry 11 to 50 pounds occasionally; lift and carry up to 10 pounds frequently; sit, stand, and walk without limitation; use the hands for simple grasping, fine manipulation, to handle objects, to feel objects, to push/pull with their hands to operate controls, and to reach on a frequent basis; use their feet to push/pull and operate controls on an occasional basis; to stoop, crouch, kneel, and crawl on an occasional basis; hear and speak without limitations; perform work that does not involve exposure to heights and moving machinery or concentrated exposure to chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations; and, perform work where the interpersonal contact is routine but superficial, the complexity of the tasks is learned by experience with several variables, the use of judgement is within limits, and the supervision required is little for routine tasks but detailed for non-routine tasks, could perform plaintiff's PRW as a general office clerk/secretary. (Tr. 460-461). Based on all of the evidence of record,

we find substantial evidence supports the ALJ's conclusion that plaintiff could return to her PRW.

Plaintiff also seems to argue that the ALJ erred in concluding that plaintiff's RFC allowed her to return to her PRW.  However, the VE testified that plaintiff's PRW was light, semi-skilled work.  (Tr. 442).  And, the ALJ concluded that plaintiff could perform a range of medium level work.  Therefore, we find no error with the ALJ's determination that plaintiff could return to her PRW.

**V.**     **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 11th day of August 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

31